UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------x

PENSION TRUST FUND FOR OPERATING ENGINEERS et al., Individually and on Behalf of All Others Similarly Situated,[1]

Plaintiffs,

-against-

CLARIVATE PLC et al.,

Defendants.

-------------------------------------x

**MEMORANDUM & ORDER**
22-CV-394(EK)(MMH)

(Consolidated with Case Nos. 22-CV-1371 and 22-CV-1372)

**Table of Contents**


I. Background .......... 3
  A. The Parties .......... 4
  B. De-SPAC Transaction and Public Offerings .......... 5
  C. Clarivate Restates Expenses and Earnings .......... 7
  D. Clarivate's Alleged Operational Struggles .......... 10
II. Procedural History .......... 15
III. Legal Standards .......... 16
  A. Rule 12(b)(6) .......... 16
  B. Rule 9(b) .......... 17
  C. The Private Securities Litigation Reform Act .......... 18
IV. Securities Act Section 11 Claims .......... 19
  A. Elements and Pleading Standard .......... 19
  B. Against the Clarivate Defendants and CGMI .......... 20
  C. Against the Fund Defendants .......... 24
    1. Fund Defendants as "Signatories" .......... 24
    2. Fund Defendants as "Underwriters" .......... 26
  D. Against PricewaterhouseCoopers .......... 32
V. Exchange Act Claims .......... 39
  A. Material Misrepresentations or Omissions Claim .......... 40
    1. Legal Standard Under Rule 10b-5(b) .......... 40
    2. Alleged Misrepresentations or Omissions .......... 41
      a. Organic Growth Projections .......... 41


[1] Since the filing of the original complaint, Pension Trust Fund for Operating Engineers, City of Birmingham Retirement and Relief System, Michigan Laborers' Pension Fund, and Town of Davie Police Pension Fund replaced Kevin Parot as the named plaintiffs. The Clerk of Court is respectfully directed to amend the caption of this case accordingly.

b. Progress Toward Organic Growth Projections ("On Track" Statements) .................... 47
c. ACV Growth ................................ 50
d. Q4 2021 Bump (Seasonality) ................ 54
e. Revenue Backlog ........................... 57
f. New Product Development and Investment .... 58
g. Transition to an Inside Sales Force (Item 303) ...................................... 60
B. Scienter ......................................... 64
1. Standard Under Section 10(b) and Rule 10b-5 .... 64
2. Plaintiffs Plausibly Allege Scienter for Jerre Stead, Richard Hanks, Mukhtar Ahmed, and Clarivate Itself ................................ 65
a. Jerre Stead ............................... 65
b. Richard Hanks ............................. 72
c. Mukhtar Ahmed ............................. 75
3. Plaintiffs Do Not Plausibly Allege Scienter for Christie Archbold or Sheryl von Bulcher ........ 77
a. Christie Archbold ......................... 77
b. Sheryl von Blucher ........................ 77
C. Scheme Liability Claim ........................... 78
VI. Control Person Liability ............................. 80
VII. Leave to Amend ...................................... 81
VIII. Conclusion .......................................... 81


ERIC KOMITEE, United States District Judge:

On February 3, 2022, Clarivate Plc announced that it would restate certain financial metrics for fiscal year 2020, as well as four individual quarters in 2020 and 2021. The firm also updated its guidance to investors, indicating that it expected to fall short of previously projected "organic" revenue growth for the full fiscal year in 2021. Clarivate stock declined 16.4% that day.

The plaintiffs in this action owned Clarivate stock. They bring securities-fraud claims against the company; current and former Clarivate officers and directors; the investment bank

that underwrote Clarivate's stock offerings (Citigroup Global Markets Inc., hereinafter "CGMI"); Clarivate's auditor (PricewaterhouseCoopers LLP, or "PwC"); and certain investment funds that acquired early equity stakes in Clarivate (the "Fund Defendants").

The complaint brings claims under two statutes. First, plaintiffs allege Securities Act claims against Clarivate, CGMI, the Fund Defendants, PwC, and certain individual defendants. These claims are predicated on Clarivate's restatement. Second, plaintiffs articulate a broader securities fraud case under the Exchange Act against Clarivate and certain individual defendants, based on the missed organic-growth projections.

The defendants now move to dismiss the complaint in its entirety. For the following reasons, the motion is granted in part.

## I. Background

The facts below are taken from the complaint and documents it incorporates by reference or that are "integral" to its allegations. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of securities filings and associated documents).

**A. The Parties**

The named plaintiffs were investors in Clarivate common and preferred stock. Am. Consolidated Compl. ("ACC") ¶¶ 8-11, ECF No. 97. They bring the Securities Act claims on behalf of all those "who purchased or acquired Clarivate securities traceable" to June and September 2021 common stock offerings, or a June 2021 preferred stock offering. *Id.* ¶¶ 51, 84. They bring the Exchange Act claims on behalf of those who "purchased or otherwise acquired Clarivate securities" between July 30, 2020 and February 2, 2022 (the "Class Period") and who were damaged thereby. *Id.* ¶¶ 3, 325.

Clarivate is an "information services and data analytics" company that spun off from Thomson Reuters in 2016. *Id.* ¶¶ 104-106. Clarivate sells subscriptions to scientific, healthcare, and intellectual property databases, as well as datasets. *Id.* ¶¶ 105, 106, 115. Clarivate went public through a reverse merger with a "special purpose acquisition company," or "SPAC," in May 2019. *Id.* ¶¶ 12, 103, 111. This type of transaction is sometimes called a "de-SPAC" transaction.

CGMI served as lead underwriter for common stock offerings by Clarivate in June and September 2021, as well as a mandatory convertible preferred stock offering in June 2021. PwC has served as Clarivate's auditor since 2016. *Id.* ¶¶ 34-35.

The Fund Defendants are Onex Corporation and various affiliated partnerships; the Baring Asia Private Equity Fund VI, L.P.1 and L.P.2; and Elgin Investment Holdings Limited (an affiliate of Baring). *Id.* ¶¶ 39-48. They purchased unregistered equity in Clarivate when it spun off from Thomson Reuters in 2016 and ultimately sold that stock in public offerings in June and September 2021. The plaintiffs assert Securities Act claims against the Fund Defendants on the theory that this sale qualifies them for "underwriter" liability thereunder.

The individual defendants are current and former officers and directors of Clarivate.[2]

**B. De-SPAC Transaction and Public Offerings**

The 2019 de-SPAC transaction that led to Clarivate's public listing was, in substance, a merger between privately held Clarivate and Churchill Capital Corp., a publicly traded special purpose acquisition vehicle. The Churchill SPAC had its

[2] Defendants Jerre Stead (former CEO and Board Executive Chairman), Richard Hanks (former CFO), Christie Archibold (former Chief Accounting Officer), Sheryl von Blucher (Board member), Kosty Gilis (Board member), Balakrishnan S. Iyer (Board member), Nicholas Macksey (Board member), Anthony Munk (Board member), Jane Okun Bomba (Board Member), Charles J. Neral (Board member), Richard W. Roedel (Board member), Valeria Alberola (Board member), Usama N. Cortas (Board member), Adam T. Levyn (Board member), and Roxane White (Board member) are the Securities Act individual defendants. ACC ¶¶ 13-15, 22-33, 50. Defendants Stead, Hanks, Archibold, and von Blucher are also sued under the Exchange Act, along with defendants Mukhtar Ahmed (former President of the Science Group), Jeffrey Roy (former President of the Intellectual Property Group), Steen Lomholt-Thomsen (former Chief Revenue Officer), and Gordon Samson (President of the Intellectual Property Group). *Id.* ¶¶ 13-21. They are the Exchange Act individual defendants.

initial public offering on the New York Stock Exchange in September 2018. *See* Churchill Cap. Corp. Proxy Statement (Schedule 14A), at 1, 5 (Apr. 26, 2019) ("Merger Proxy").

In the de-SPAC transaction, Clarivate's owners — the Fund Defendants — exchanged their shares of private Clarivate for an approximately 74% stake in the public entity that emerged from the combination. *Id.* at 13–16. The remaining equity in the public entity (approximately 26%) went to Churchill shareholders. *Id.* at 15–16. The proxy statement projected that, after giving effect to vesting restrictions, the Fund Defendants would own roughly 71% of Clarivate's equity. *Id.* at 16. The Fund Defendants and the SPAC founders also received registration rights — that is, the right to "request" Clarivate to "effect" a public offering of their shares, or to participate in any offering undertaken by Clarivate. *See id.* at 77, A-1-A-4 to A-1-A-6.

Clarivate conducted the first offering contemplated by this agreement in June 2021. ACC ¶ 54. The company sold $750 million in newly issued common shares; alongside this, the Fund Defendants sold $250 million of their holdings. *Id.* Clarivate also sold $1.25 billion in newly issued convertible preferred shares. *Id.* ¶ 55. In September of that year, Clarivate conducted a second offering, this time of $631 million of common stock held solely by the Fund Defendants. *Id.* ¶ 59. At the end

of 2021, following these stock sales, the Fund Defendants held less than 10% of Clarivate's common stock. *Id.* ¶ 110.

In connection with each sale, the Fund Defendants signed Underwriting Agreements that were "incorporated by reference into the respective share Offering Materials," pursuant to the June 19, 2020 and July 1, 2021 Form S-3 Registration Statements. *Id.* ¶¶ 46-47; Clarivate Plc, Registration Statement (Form S-3) (June 19, 2020) ("2020 Shelf Registration Statement"); Clarivate Plc, Registration Statement (Form S-3) (July 1, 2021) ("2021 Shelf Registration Statement"). The plaintiffs point to these signatures in their effort to ascribe underwriting liability to the Fund Defendants.

**C. Clarivate Restates Expenses and Earnings**

On December 27, 2021, Clarivate announced that several of its previously filed financial statements should no longer be relied upon due to accounting errors. Clarivate Plc, Current Report (Form 8-K) (Dec. 27, 2021). The 8-K indicated that the company had understated expenses by as much as $185 million. *Id.* The company noted that restated financials would follow. *Id.* This restatement is, as noted above, the basis for the plaintiffs' Securities Act claims.

On February 3, 2022, Clarivate amended four SEC filings: its 2020 Form 10-K and its quarterly reports (on Form 10-Q) for the first three quarters of 2021 (together, the

"Restatement"). ACC ¶ 53. The amended filings included restated financial statements for the fourth quarter of 2020, full year 2020, and first three quarters of 2021. *Id.* ¶¶ 53, 66 (summarizing the restated expenses and net income). The erroneous financial statements (with the exception of Q3 2021) had been incorporated into offering materials for Clarivate's June and September 2021 stock offerings, which had been conducted pursuant to Clarivate's Shelf Registration Statements. *Id.* ¶¶ 56-62. Clarivate's Shelf Registration Statements were signed by many of the individual defendants in this lawsuit.[3]

The Restatement purported to correct three errors stemming from Clarivate's acquisition of two companies — Decision Resources Group ("DRG") and CPA Global — in 2020. *See* Clarivate Plc, Amended Annual Report (Form 10-K/A), at 189-90 (Feb. 3, 2022) ("Amended 2020 10-K"); ACC ¶ 64. First, Clarivate had incorrectly accounted for a stock-based compensation plan that CPA Global had instituted for its employees. ACC ¶ 64. Specifically, Clarivate had treated "the majority of the expenses" associated with this plan as having already been accrued — that is, as a liability — at the time of the acquisition. *Id.*; Amended 2020 10-K 81. Instead, Clarivate

[3] Defendants Stead, Hanks, Archbold, von Blucher, Gilis, Iyer, Macksey, Munk, Bomba, Neral, and Roedel signed both Shelf Registration Statements. Defendant Klein signed the June statement, while defendants Alberola, Cortas, Levyn, and White only signed in September. ACC ¶¶ 56, 60.

acknowledged that it should have recognized these expenses as "share-based compensation" expenses over their subsequent one-year vesting period. Amended 2020 10-K 81. This change had the effect of increasing expenses and reducing earnings for all but one of the affected periods.

Second, Clarivate had incorrectly accounted for 6,325,860 shares that it had issued to CPA Global's owner. Those shares were issued to this owner, but then "returned to Clarivate" to fund an employee benefit plan established for CPA Global employees. *Id.* at 99. Such shares should thus not have been included in the consideration Clarivate paid for CPA Global. *Id.* Finally, Clarivate had understated certain deferred tax liabilities — the complaint does not allege (and Clarivate's filings do not clarify) what kind — in accounting for the acquisitions of both DRG and CPA Global. *Id.* at 81.

The upshot of these three errors, according to the Restatement, is that Clarivate had understated expenses by more than $120 million from Q4 2020 through Q2 2021 — understatements of 9.2% (Q4 2020), 3.1% (full-year 2020), 7.6% (Q1 2021), and 11.2% (Q2 2021). ACC ¶¶ 63, 66. The complaint does not include allegations related to Q3 2021, for which Clarivate restated expenses *downward*, raising net income for the quarter. Clarivate Plc, Amended Quarterly Report for Q3 2021 (Form 10Q/A), at 69 (Feb. 3, 2022).

Clarivate issued the Restatement simultaneously with updated, lowered estimates for 2021 (though the complaint erroneously alleges that Clarivate published full-year financial information that day). *Compare* ACC ¶ 196 ("On February 3, 2022, Clarivate posted disappointing organic growth numbers for the fourth quarter of 2021 . . . ."), *with* Clarivate Plc, Ex. 99.1 to Current Report (Form 8-K) (Feb. 3, 2022) ("Restatement Press Release") ("Clarivate expects to report its financial results for the fourth quarter and full year 2021 in early March."). The market reaction was brutal: Clarivate stock declined 16.4%, on a day when the S&P 500 Index declined only 2.4%. ACC ¶ 299.

**D. Clarivate's Alleged Operational Struggles**

Clarivate's business allegedly struggled in the years after it went public. *See id.* ¶¶ 145, 151. Management had presented Clarivate to investors as an "organic growth machine," *id.* ¶ 199 — that is, a company that could grow without relying on acquisitions. By the first quarter of 2022, however, investors had "lost confidence in Clarivate's business, management, and value proposition as a growth company." *Id.* ¶ 197. Plaintiffs rely on several confidential witnesses ("CWs") to describe this struggle. *See, e.g.*, *id.* ¶ 146.

***"Seasonality" and the Migration to a "Software as a Service" Model.*** Soon after the reverse merger closed in May 2019, Clarivate's new management, led by defendant Stead,

"migrate[d] all of Clarivate's products to [a Software as a Service ('SaaS')] model." *Id.* ¶ 112. The SaaS model (generally speaking) contemplates the sale of subscriptions to software products. *Id.* Clarivate's "focus on subscription revenues . . . was supposed to generate highly predictable free cash flow that could be directed towards growth." *Id.* ¶ 113. The new expectation was that subscribers would "typically sign a contract for the full year," but pay "monthly," allowing Clarivate and its investors to anticipate monthly payments from a particular customer even without further sales. *See id.* In addition to this subscription revenue, Clarivate also earned "transactional revenues" from discrete sales of, for example, individual data sets. *Id.* ¶ 115.

Clarivate implemented this change to a subscription model at DRG, one of the companies it acquired in 2020. Predictability would be a shift from the traditional seasonality and transactional nature of DRG's revenue stream. When acquired, 30% of DRG's revenues were transactional, and 36% of its revenues came during the fourth quarter. *Id.* ¶ 174. This weighting was due to the seasonality of transactional revenues. *See id.* ¶¶ 176, 178. The transition to a subscription model was underway at DRG by the second half of 2020. *See id.* ¶ 175. And by the fourth quarter of 2021, defendants claimed that this transition had occurred, describing DRG's revenue as "equalized

through the year." *Id.* ¶ 176. Through the CWs, the plaintiffs allege that this transition "cannibalized DRG's Q4 transactional revenues." *Id.* ¶ 177. Plaintiffs allege that the defendants nevertheless continued to predict a fourth-quarter revenue bump throughout the second half of 2021 to pacify investor concerns. *Id.* ¶¶ 181, 182.

***Tracking Sales Internally.*** Throughout the Class Period, Clarivate's salespeople used the company's customer relationship management systems ("CRMs") to track potential sales from inception through consummation. *Id.* ¶ 126. Clarivate aggregated these subscription and transactional revenues in multiple non-GAAP metrics that they presented to investors. *Id.* ¶ 116. Two of these were "Annualized Contract Value" ("ACV") and "backlog." *Id.* ACV is a metric for tracking subscription revenue that has been "contracted-for but not yet recognized." *Id.* ¶ 120. It represents "the annualized value for the next 12 months of subscription-based client license agreements, assuming that all expiring license agreements during that period are renewed at their current price level." *Id.* (quoting 2021 Form 10-K). "Backlog," according to plaintiffs, is "a term of art" that "refers to the amount of product sold but for which delivery has not yet occurred, and thus revenue has not yet been recognized." *Id.* ¶ 117.

***Growth Projections.*** During the Class Period, defendants made projections about Clarivate's organic growth. In investor presentations, Clarivate projected "4%-6% organic growth by the end of 2020." *Id.* ¶ 134. Clarivate reiterated that growth target on each investor call in 2020. *Id.* ¶ 136. At the company's November 10, 2020 Investor Day, Clarivate projected that revenues would grow organically at a rate between 5.5% and 6.5% for the full year of 2021, accelerating to between 6% and 8% "exiting 2021." *Id.* The plaintiffs challenge this projection.

The references to an "exit" growth rate recurred in the defendants' statements to investors. *See, e.g.*, *id.* ¶¶ 122, 186. The complaint does not indicate that the defendants ever defined them, but the plaintiffs attempt to: as used by Clarivate and analysts, according to the complaint, an "exiting" figure was one for the final quarter of a given year, compared to the final quarter of the prior year. *See, e.g.*, *id.* ¶¶ 166-167 (8-K comparing organic growth in fourth quarter 2020 to "the prior year period"); *id.* ¶ 172 (analyst report noting that "the jump from 2.4% growth . . . in fourth quarter 2020 to the 6%-8% target range exiting 2021 appears ambitious at first glance"); *id.* ¶ 237 (Stead explaining that "Q4 will be very strong as we exit"). Clarivate reiterated these "exit" projections "on nearly every conference call throughout 2021." *Id.* ¶ 136.

***The "Inside Sales" Model.*** In pursuit of revenue growth targets, plaintiffs say, Clarivate raised prices and shifted to an "inside sales" model under which the company would service customers out of "call centers" instead of using field agents. *Id.* ¶¶ 137-139. Clarivate also endeavored to reduce costs, including by "firing or laying people off, failing to backfill vacated positions, and failing to adequately invest in product quality and new products." *Id.* ¶¶ 142-144. As "uniformly reported" by the six CWs, these changes left Clarivate "disorganized and drove away key sales people, subject matter experts, and the analysts needed to provide strategic insights to Clarivate's customers," and those positions were not backfilled. *Id.* ¶ 146.

***Organic Growth Targets.*** Against this backdrop, Clarivate missed its organic growth targets for 2020 and 2021. *Id.* ¶¶ 166, 197. Clarivate reported 4.5% organic growth in 2021, rather than its projected 5.5%-6.5% rate for that year. *Id.* ¶¶ 136, 197. Additionally, the company reported organic growth of 1% in the fourth quarter of 2020 and 4% in the fourth quarter of 2021, rather than its projected "exit" rates of 4%-6% in 2020 and 6%-8% in 2021. *See id.* ¶¶ 134, 136, 166, 197. Plaintiffs' CW-6 stated that despite an "increase[] [in] collections [of] approximately $240 million in 2021 over 2020," nevertheless "sales had declined." *Id.* ¶ 150. Based on

"track[ing] the order book as it came in," CW-6 identified a "7% sales decrease in 2021 from the prior year." *Id.*

Clarivate's misses surprised investors. When Clarivate restated its financials, it also updated its estimate for 2021 organic growth, lowering the rate from 5.5%-6.5% to 4.5%. *Id.* ¶¶ 210, 299; Restatement Press Release. This led multiple analysts to downgrade their outlook for Clarivate stock. *See* ACC ¶¶ 197, 299.

In sum, plaintiffs allege that Clarivate and its leaders fostered the perception among investors that Clarivate was on track to meet organic growth targets, despite knowing that the "promised growth was not materializing." *See id.* ¶ 151. Plaintiffs allege that this perception was the result of material misrepresentations or omissions, in violation of SEC Rule 10b-5(b), as well as a fraudulent scheme, in violation of SEC Rules 10b-5(a) and (c).

## II. Procedural History

The plaintiffs' first action, No. 22-CV-394, commenced on January 24, 2022, before Clarivate filed the Restatement. Two additional cases, No. 22-CV-1371 and No. 22-CV-1372, followed on March 11 of that year. The three cases were consolidated on May 18, 2022. Order, ECF No. 21. Also on that date, the Pension Trust Fund for Operating Engineers was appointed the lead plaintiff. *Id.* Plaintiffs filed a

consolidated complaint on August 8, 2022. ECF No. 30 ("Consolidated Compl."). All defendants moved to dismiss the consolidated complaint. *See* ECF Nos. 23, 62, 65, 73, 75.

The Court held oral argument on the motions to dismiss on May 19, 2023. Following oral argument, the Court requested supplemental briefing on whether, if the Court were to dismiss one or more claims, such dismissal should be with prejudice or whether the Court should grant leave to amend with any dismissal. *See* ECF Nos. 90-93. After considering the supplemental briefing, the Court *sua sponte* granted plaintiffs limited leave to amend their complaint. Mem. & Order, ECF No. 94. The Court now proceeds to consider the fully briefed motions to dismiss the ACC.

## III. Legal Standards

### A. Rule 12(b)(6)

To overcome a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[4] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

[4] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, the district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). However, the court need not construe legal conclusions dressed as facts in favor of the plaintiff. *See Iqbal*, 556 U.S. at 678.

**B. Rule 9(b)**

Private securities fraud actions brought pursuant to the Exchange Act are subject to the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* Rule 9(b) does not extend to Securities Act claims that are — like Counts I and II of the ACC — not premised on allegations of

fraud. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *see* ACC ¶ 82 (expressly disclaiming fraud).

**C. The Private Securities Litigation Reform Act**

Exchange Act claims (but not Securities Act claims) are also subject to the Private Securities Litigation Reform Act ("PSLRA"). *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021); *see* 15 U.S.C. § 78u-4(a)(1) (PSLRA "shall apply in each private action arising under this chapter [2B] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure"). The PSLRA goes further than Rule 9, requiring plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Thus, plaintiffs "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). The PSLRA also reaches scienter; plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## IV. Securities Act Section 11 Claims

Plaintiffs assert primary liability claims under Section 11 of the Securities Act against Clarivate, certain Clarivate executives and Board members,[5] CGMI, the Fund Defendants, and PwC for making materially misleading statements in connection with a securities offering. 15 U.S.C. § 77k(a). Plaintiffs also bring control-person liability claims under Section 15 of the Act against Clarivate and the individual Securities Act defendants. *Id.* § 77o.

### A. Elements and Pleading Standard

Section 11 of the Securities Act concerns registration statements. It imposes liability on certain participants in a registered securities offering (like the June and September 2021 Offerings) when the offering documents contain materially misleading statements or omissions. 15 U.S.C. § 77k(a). These participants include several categories relevant here: individuals who signed the registration statement, the corporate issuer itself, and its directors, accountants, and underwriters.

To state a claim under Section 11, the plaintiff must allege that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the

[5] As noted above, the individual defendants sued pursuant to Section 11 are defendants Stead, Hanks, Archbold, Gilis, Iyer, Macksey, Munk, Bomba, Neral, Roedel, Alberola, Cortas, Levyn, and White. ACC ¶ 50.

offering;[6] (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010). Section 11 does not "requir[e] any particular state of mind or scienter." *In re Synchrony*, 988 F.3d at 172.

**B. Against the Clarivate Defendants and CGMI**

Plaintiffs argue that the Clarivate Defendants — Clarivate and certain individuals — and CGMI are liable under Section 11 of the Securities Act for the accounting errors concerning the acquisitions of DRG and CPA Global that were corrected by the Restatement. ACC ¶¶ 82-92. Specifically, they allege that the net income and expenses reported in Clarivate's

[6] It remains unclear, at this stage, whether plaintiffs intend to include aftermarket purchasers in the class definition. *Compare* ACC ¶ 84 ("This Count is asserted by Plaintiffs and members of the Class who purchased or acquired Clarivate securities traceable to the Offering Materials."), *with id.* ¶ 92 ("[T]he Securities Act Defendants violated § 11 of the Securities Act and are liable to Plaintiffs and the members of the Class who acquired Clarivate securities in the June 2021 Offerings and September 2021 Offering, each of whom has been damaged as a result of such violations." Aftermarket purchasers must "trace their shares to an allegedly misleading registration statement" to prevail under Section 11. *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003). This tracing "may be established either through proof of a direct chain of title from the original offering to the plaintiff or through proof that the plaintiff bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006).

2020 10-K, Q1 2021 10-Q, and Q2 2021 10-Q were materially misleading. *Id.* ¶¶ 66, 71, 74, 76, 78. The parties do not dispute that plaintiffs purchased registered Clarivate securities, that these defendants may be liable under Section 11, or — at least at this stage — that the registration statements included an untrue statement (the erroneous financial statements). Thus, whether plaintiffs state a Section 11 claim against the Clarivate Defendants and CGMI turns on the third element: namely, whether Clarivate's registration statement contained any untrue statement (or omission) of a *material* fact.

A fact is material if there is a "a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991). "Determination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination." *Id.*

The Clarivate Defendants and CGMI argue that allegations of stock-price decline, without more, are insufficient to allege materiality. *See* Clarivate Suppl. Ltr. 3, ECF No. 100. They also argue the plaintiffs have set out no basis to conclude that the restated metrics were material to investors. *Id.*

Neither argument is ultimately persuasive. True, the 16.4% drop in Clarivate's stock price is not, as the defendants point out, *sufficient* to establish materiality; but neither is it irrelevant to that analysis. *See Bilzerian*, 926 F.2d at 1298 (stock-price movement "is a factor the jury may consider relevant" to materiality); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (considering "precipitous decrease in share price" as part of materiality analysis).

Beyond the stock-price decline, we have the sheer magnitude by which certain key metrics changed in the Restatement. For the earnings statements at issue here, Clarivate understated its expenses by amounts ranging from 3.1% to 11.2%. ACC ¶ 66. That resulted in overstating net income by 12.4% to 133.6% in the various quarters, and flipped the earnings result in one quarter — Q4 2020 — from a profit to a loss. *Id.* At the risk of stating the obvious, earnings is a key metric. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) ("[E]arnings reports are among the pieces of data that investors find most relevant to their investment decisions.").[7]

[7] The Restatement itself acknowledged as much: while materiality is ultimately, of course, an issue for a jury, the document stated the view "that the impacts were material to the Company's financial statements prepared according to U.S. generally accepted accounting principles." ACC ¶ 69.

These changes generally exceed the "presumptive 5% threshold of materiality" for misstatements of a "particular item" on financial statements. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717-19 (2d Cir. 2011); *see also Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 403 (S.D.N.Y. 2022) (misstatement of net cash from financing activities of less than 5% presumptively immaterial); *see generally* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 12, 1999).

The presumption is a "rule of thumb" that "is not conclusive." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Courts also consider qualitative factors, including whether the alleged misstatements "masked a potential change in earnings or other trends," and whether the misstatement "relates to a segment that plays a significant role in the registrant's business." *Litwin*, 634 F.3d at 720, 722.

Here, Clarivate's errors allegedly "masked a potential change in" net income by at least 12%, and as much as 133.6%. *See* ACC ¶¶ 66, 69. And the acquisition accounting was allegedly central to the story Clarivate was telling investors: the company had described the DRG and CPA Global acquisitions as "transformative" and a source for cross-selling, another driver of organic growth. *Id.* ¶ 214. A reasonable shareholder would plausibly have wanted a clear understanding of how these

acquisitions were affecting the company's results. Put otherwise, the "significance" of these acquisitions "to the company's operations and profitability" supports the inference of materiality. *Celestica, Inc.*, 455 F. App'x at 16.

Thus, the motion to dismiss is denied as to the Section 11 claims against the Clarivate Defendants.

**C. Against the Fund Defendants**

Plaintiffs also assert Section 11 claim against the Fund Defendants. Those defendants are liable, plaintiffs claim, under two separate theories: first, because they "signed the offering materials," and second, because they functioned as underwriters. Neither theory has merit.

1. Fund Defendants as "Signatories"

Section 11 of the Securities Act establishes liability for "every person who signed the registration statement" that is false or misleading. 15 U.S.C. § 77k(a)(1). The plaintiffs argue that the Fund Defendants qualify as such.

This argument proceeds by way of a tenuous syllogism. Plaintiffs do not contend that the Fund Defendants signed the actual registration statement (on Form S-3) itself. Nor could they, as the Fund Defendants' signatures do not appear on the signature blocks for the S-3. 2020 Shelf Registration Statement II-4 to II-5; 2021 Shelf Registration Statement II-5-II-7. Instead, they point to underwriting agreements that the Fund

Defendants signed, and that the issuer then attached to the registration statement as *exhibits*. Because the statute defines "registration statement" to include documents filed as part of such statement or incorporated therein by reference, *see* 15 U.S.C. § 77k(a), the plaintiffs contend that every party whose signature appears on any such exhibit must be a "signatory" of the registration statement itself.

If there is any case holding that simply signing an exhibit gives rise to underwriting liability, the plaintiffs have not cited it (nor has the Court unearthed it). The contention finds no support in the language of the statute itself, which establishes liability for those who sign the registration statement, not exhibits thereto. *Id.*; *see generally In re Lehman Bros. MBS Litig.*, 650 F.3d 167, 175 (2d Cir. 2011) (Section 11 liability is "limited" to "statutorily enumerated parties"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (describing Section 11 liability as "limited in scope").

And this aspect of the plaintiffs' theory would, if adopted, lead to absurd results. The plaintiffs lean heavily on the Fund Defendants' acknowledgment that the underwriting agreement was "one of the exhibits 'filed as part of th[e] Registration Statement.'" *See* Pls.' Opp. to Funds 6-7, ECF No. 79. But the SEC calls for a panoply of documents to be attached

as exhibits to registration statements, including some typically signed by parties who might be shocked to find themselves named as defendants to a Section 11 claim. For example, issuers who file on Form S-1 (though not S-3) are required to attach certain material contracts. 17 C.F.R. § 229.601(b)(10). Would the arm's-length counterparties to those contracts — who may be total strangers to the offering in question — also be subject to Section 11 liability? If there is a reason that the plaintiffs' theory would exclude them, it does not readily appear on the face of the briefing.[8]

In the end, even putting aside its overbreadth, the plaintiffs' argument fails straightforwardly at its first step: the Fund Defendants signed underwriting agreements, not the registration statement, so they are not liable as signatories to the registration statement.

2. Fund Defendants as "Underwriters"

Section 11 also establishes liability for "every underwriter" of a given offering. The plaintiffs endeavor to label the Fund Defendants "underwriters," too, but this contention fares no better than the signatory argument.

[8] The plaintiffs do attempt to distinguish other exhibit-signatories from the Fund Defendants on the basis that they did not sell their shares in the offering. Pls.' Opp. to Funds 11 & n.9. This distinction is germane to the plaintiffs' argument that the Fund Defendants served as *underwriters* (addressed in the next section). But it is not apparent why this would affect the assessment of their liability as *signatories*.

Here, the contention is that the Fund Defendants underwrote the offering because (a) they sold millions of their shares in the offerings, and (b) in doing so, they "were critical to the distribution" of those shares to the investing public. Pls.' Suppl. Ltr. 3, ECF No. 102. In making this argument, the plaintiffs attach substantial significance to the fact that the Fund Defendants sold in the offerings pursuant to the registration rights they had negotiated for years earlier, when they first obtained their stakes in Clarivate. *Id.*

An underwriter is:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11). In *practice*, underwriters perform a variety of functions in connection with a public offering of securities. An issuer like Clarivate, which is in the business of selling database subscriptions, not securities, engages an underwriter — usually an investment bank — to assist in the structuring, marketing, pricing, and ultimate distribution of the securities. *See, e.g.*, *Slack Techs. LLC v. Pirani*, 598 U.S. 759, 768 (2023) ("Investment banks underwrite the offering . . . ."). As investment managers, the Fund Defendants are not in the business of underwriting. They invest in securities to

generate returns for their investors, rather than conducting road shows and soliciting indications of interest in new issues like investment bankers do.[9]

These practical roles are not, however, necessarily dispositive. As the text quoted above indicates, stock and bond purchasers can be deemed underwriters if they act "with a view to," or sell "in connection with," the distribution of a security — even if they are not in the business of underwriting. *See, e.g.*, *SEC v. Caledonian Bank*, 145 F. Supp 3d 290, 309 (S.D.N.Y. 2015). "Whether one acquires shares with a view to distributing them depends on whether one had 'investment intent' or intended only to sell the shares." *Id.*

Which brings us to the question of what constitutes intent to distribute. A distribution is the "process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966); *see* 15 U.S.C. § 78j(b). Courts consider various factors to identify the intent to facilitate distribution.

---

[9] Indeed, the underwriting agreements signed by the Fund Defendants in this case recognize this distinction. The definition of "underwriters" includes CGMI and other banks, but excludes the Fund Defendants. Clarivate Plc, Ex. 1.1 to Current Report (Form 8-K), at 1, A-1 (June 14, 2021) ("June 2021 Underwriting Agreement"); Clarivate Plc, Ex. 1.1 to Current Report (Form 8-K), at 1, A-1 (Sept. 9, 2021) ("September 2021 Underwriting Agreement"). And in both underwriting agreements, the Fund Defendants granted those underwriters an option to purchase additional shares (a so-called greenshoe provision). June 2021 Underwriting Agreement 16; September 2021 Underwriting Agreement 15.

These include the length of the purchaser's holding period and the indications of their intent at the time of purchase.

***Holding Period.*** The holding period would seem, at first blush, an odd metric from which to infer "investment" or "distribution" intent. Investors generally aspire to buy low and sell high, rather than to sell after any given length of *time*. The rational investor buys stock that she believes is worth more than the price at which it is offered to her. After her purchase, she will (generally speaking) be motivated to sell when the stock reaches or exceeds her price target, regardless of whether she has held the stock for three hours or three years. Thus, in the case of an investor who is focused on a security's intrinsic value, the holding period may be a secondary consideration (at most).[10] Whether the holding period is a useful metric in this context or not, however, the straightforward application of this factor cuts strongly against the instant plaintiffs.

Here, the Fund Defendants' holding periods were approximately five years — from the July 2016 acquisition from

[10] To be sure, the holding period is a valuable metric by which to identify "distribution" intent in one circumstance not present here: the "pump and dump" scheme. In a typical iteration of that scheme, the initial purchasers may be the issuer's (or the underwriter's) co-conspirators. These purchasers, often "nominees," may sell newly issued shares back and forth to one another to drive increasing prices (and volume), so as to create the illusion of strong demand. *See, e.g.*, *Caledonian Bank*, 145 F. Supp. 3d at 307-08. Many of the cases on which the plaintiffs rely were decided in this (easily distinguishable) context.

Thomson Reuters to the June 2021 stock offering (and more than two years if measured from the de-SPAC transaction). Several district courts have observed that a holding period in excess of two years precludes a finding of distributive intent. *E.g.*, *United States v. Sherwood*, 175 F. Supp. 480, 483 (S.D.N.Y. 1959) (two-year holding period was an "insuperable obstacle" to the finding that purchaser acted with a view to distribution); *see also SEC v. Olins*, No. C-07-6423, 2010 WL 900518, at *2 (N.D. Cal. Mar. 12, 2010) ("[C]ourts look to whether the defendant held the shares for a period of more than two years."); 17 C.F.R. § 230.144(d)(1) (sellers of certain restricted securities not underwriters if securities are held for more than six months). The de-SPAC transaction is not particularly relevant here, as the Fund Defendants emerged from that transaction with the *dollar* exposure they held before, even if their ownership percentage in the company declined. *See* ACC ¶ 48. The shift from a private equity stake to public does not undermine a finding of investment intent.

***Indicia of Intent at Purchase***. Also fatal to this claim is that the Fund Defendants did not purchase securities with an eye towards distribution. They were founding investors in Clarivate, having purchased its shares in the spinoff from Thomson Reuters. *Id.* ¶ 106. Under the Fund Defendants' ownership, Clarivate "built a new senior executive management

team, completed a number of acquisitions, and worked on fully transitioning the business away from reliance on Thomson Reuters." *Id.* The Fund Defendants took an active role in these operations. *See id.* (describing Clarivate Board member since 2016 who was a managing director at Baring); Merger Proxy 138 ("Onex, Baring and a new executive team have focused on transitioning the Company to be independent and have completed a substantial number of operational improvements . . . ."). Underwriters do not get so involved in a company's operations.

The de-SPAC transaction and registration rights agreement the Fund Defendants signed in 2019 do not alter our conclusion. Oral Arg. Tr. 84:6–86:20, ECF No. 88; *see* ACC ¶ 110. The registration rights agreement gave the Fund Defendants the right (but not the obligation) to require registration of their shares in certain circumstances. ACC ¶ 48. There is no incompatibility between investment intent, on the one hand, and registration rights, on the other, as every investor will wish for a process by which they can exit the investment at some point. *See Harriman v. E.I. du Pont de Nemours & Co.*, 411 F. Supp. 133, 162 (D. Del. 1975) ("The existence of the [registration rights] agreement cannot be taken as an indication of an intent to sell, but rather is a common business practice in appropriate circumstances."). If plaintiffs' view here was correct, then most early-stage

investors could be construed as underwriters by virtue of selling their own shares after their companies go public.

Thus, plaintiffs have failed to state a claim that the Fund Defendants are underwriters or registration statement signatories. The Section 11 claims against the Fund Defendants are dismissed.

**D. Against PricewaterhouseCoopers**

Section 11 also provides acquirors of securities a path to holding the issuer's auditor liable. But not for all misstatements or omissions in a registration statement: only those that the auditor "prepared or certified," and as to which the auditor has consented to being named as having done so. 15 U.S.C. § 77k(a)(4).

The parties dispute which statements may give rise to PwC's liability as Clarivate's auditor under this standard. The plaintiffs argue that PwC is liable for all misstatements or omissions in the full-year 2020 *financial statements* it certified, including (for example) the income and expense numbers that were subsequently restated. Pls.' Opp. to PwC 10, ECF No. 68.

PwC, for its part, does not dispute that those financial statements contained material misrepresentations or omissions. But it argues that it cannot be held liable for them — only, it argues, for statements and omissions in its *audit*

*report*. Clarivate Plc, Annual Report (Form 10-K) (2020 10-K), at 67 (Feb. 26, 2021). And, PwC continues, the audit report's contents are statements of opinion for which it cannot be held liable under *Omnicare* and its progeny. PwC Suppl. Ltr. 1-2, ECF No. 98 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176, 195 (2015)).

PwC's reading of the Securities Act is squarely foreclosed by settled law (both pre- and post-*Omnicare*). The firm clearly "certified" Clarivate's "consolidated balance sheet[,] . . . statement[] of operations[, and statement] of comprehensive income . . . and of cash flows" for the full-year 2020, through its audit report.[11] 2020 10-K 67. PwC may therefore be held liable under Section 11 for misstatements and omissions in those financial statements such as net income and expenses (subject to the due-diligence defense set out elsewhere in the Securities Act, and discussed below). This conclusion emerges from the plain language of Section 11(a)(4), from other securities law and regulations, and from the prevailing case law in this Circuit.

[11] That report contained PwC's statement that "[i]n [its] opinion," Clarivate's "consolidated financial statements" "present fairly, in all material respects, the financial position of the Company" and "the results of its operations and its cash flows" during the contested periods. 2020 10-K 67.

The "prepared or certified" language in Section 11 has been in the Securities Act since its adoption in 1933.[12] Legal-dictionary definitions of "certify," from that period and now, confirm that PwC's audit report "certified" the financial statements at issue. *See, e.g.*, *Certify*, Black's Law Dictionary (3d ed. 1933) ("To testify in writing; to make known or establish as a fact. *To vouch for a thing in writing*. To give a certificate, *or to make a declaration about a writing*." ); *Certify*, Black's Law Dictionary (12th ed. 2024) ("To authenticate or verify in writing. To attest as being true *or as meeting certain criteria*.") (all emphases added). Lay dictionaries are in accord.[13] These definitions plainly encompass PwC's statement that Clarivate's "consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of the Company." 2020 10-K 67.

This understanding of "certify" is also dictated by language found elsewhere in the Securities Act itself, which requires a registration statement to include a balance sheet and a profit and loss statement "certified by an independent public

[12] Securities Act of 1933, ch. 38, 48 Stat. 74, 82 (codified at 15 U.S.C. § 77k(a)(4)).

[13] *See, e.g.*, *Certify*, American Heritage Dictionary (3d ed. 1992) ("To confirm formally as true, accurate, or genuine. To guarantee as *meeting a standard*." ); *Certify*, Webster's New International Dictionary (2d ed. 1946) ("To give certain information of; to make certain, as a fact; to attest authoritatively; *to verify*.") (all emphases added).

or certified accountant." 15 U.S.C. § 77aa(25)-(26).[14] That consistent (and nearby) usage confirms that PwC "certified" the financials at issue. *See, e.g.*, *Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.").[15]

The case law, too, is squarely at odds with PwC's position. The Second Circuit has written — post-*Omnicare* — that an "outside auditor" is "responsible under Section 11 for any material inaccuracy in the [issuer's] registration statements that it certified, or in financial reports incorporated in those statements." *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 52 (2d Cir. 2024).

Several district court cases are in accord. *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 260 (S.D.N.Y. 2015) ("Accountants may be found liable under Section

[14] Given this language, PwC's argument about the limits of its certification would, if true, leave Clarivate's offering in violation of the Securities Act. *See, e.g.*, *United States v. Arthur Young & Co.*, 465 U.S. 805, 810-11 (1984) ("[V]arious provisions of the federal securities laws require publicly held corporations to file their financial statements with the [SEC]. Commission regulations stipulate that these financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards.").

[15] SEC *regulations* are consistent. They provide that "[t]he term *certified*, when used in regard to financial statements, means examined and reported upon with an opinion expressed by an independent public or certified public accountant." Regulation S-X, 17 C.F.R. § 210.1-02(f); *see* Regulation S-K, 17 C.F.R. § 230.405.

11 for portions of registration statements that they audited.”); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 378-79 (S.D.N.Y. 2011); ; *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005); *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1116 (E.D. Cal. 2017).[16]

PwC attempts to resist this conclusion by resort to Section 11’s use of “consent,” arguing that its consent was limited to the audit report and that it did not provide consent to having certified any part of Clarivate’s registration statement. PwC Suppl. Ltr. 2-3. But it clearly “consent[ed] to the incorporation by reference” of its February 26, 2021 audit report of Clarivate’s 2020 financial statements (with two carveouts not relevant here) in Clarivate’s Shelf Registration Statements. Clarivate Plc, Ex. 23.1 to Amended Annual Report (Form 10-K/A) (May 10, 2021); Clarivate Plc, Ex. 23.1 to Registration Statement (Form S-3) (July 1, 2021). PwC was also listed under the heading “Experts” in the relevant Shelf Registration Statements. The Form S-3 Registration Statement reads: “The financial statements of Clarivate Plc . . . incorporated into this prospectus by the reference to the” 2020

[16] Plaintiffs also argue that PwC’s audit reports are themselves materially false or misleading, but given the foregoing, we need not reach this issue. *See* Pls.’ Opp. to PwC 1-3.

Form 10-K "have been so incorporated in reliance on" PwC's audit report, "given on the authority of [PwC] as experts in auditing and accounting." 2021 Shelf Registration Statement 46; 2020 Shelf Registration Statement 40 (same). It is thus apparent from Clarivate's SEC filings that PwC is the "independent public or certified accountant" that "certified" Clarivate's balance sheet and profit and loss statement to enable registration of Clarivate's securities. *See* 15 U.S.C. § 77aa(25)-(26) (requiring certification for securities offerings).

In support of its contention that it can be held liable only for material misstatements in its own audit report, PwC relies primarily on two Court of Appeals decisions: the Second Circuit's unpublished order in *Querub v. Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016), and a more recent decision from the Ninth Circuit, *Hunt v. PricewaterhouseCoopers LLP (PwC)*, 159 F.4th 603 (9th Cir. 2025). Neither compels the outcome that PwC seeks.

PwC invokes *Querub*'s observation that "[a]udit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims." *Querub*, 649 F. App'x at 58. That is of course true as to the auditor's own statements, but it says nothing one way or the other about the

auditor's liability for the statements that the issuer makes and the auditing firm certifies.

PwC also relies heavily on *Hunt*, 159 F.4th at 614-16. *Hunt*, in this Court's view, was decided incorrectly. The opinion begins by acknowledging that those who certify the financials set forth in a registration statement are liable for misstatements contained therein. It then goes on, in a section entitled "PwC is not liable as a certifier," to acknowledge that PwC did certify the financial statements at issue. *Id.* at 614. But the opinion then shifts gears, holding that PwC cannot be liable because an auditor is not a "guarantor" of the accuracy of every statement in the registration materials. *Id.* at 616. This, again, is true insofar as it goes: it is correct that auditors do not occupy the status of guarantors. But that is not because they are outside the realm of "certifier" liability in Section 11(a)(4) to begin with. Instead, it is because they benefit from the affirmative due-diligence defense in Section 11. *See* 15 U.S.C. § 77k(b)(3)(B)(1) (setting out defense); *see also In re Wachovia*, 753 F. Supp. 2d at 378-79 ("[A]lthough issuers are subject to virtually absolute liability under Section 11, experts such as accountants who have prepared portions of the registration statement are accorded a due diligence defense.").

For the foregoing reasons, PwC's motion to dismiss the Section 11 claims is denied.

## V. Exchange Act Claims

In addition to the Securities Act claims arising from Clarivate's restated financials, plaintiffs bring claims under Section 10(b) of the Securities Exchange Act of 1934, challenging various statements concerning the company's performance that the defendants made on earnings calls, at investor conferences, and in other settings. Plaintiffs allege that these statements "artificially inflated" the price of Clarivate securities, and that they "would not have purchased or otherwise acquired" these securities had they "known the truth." ACC ¶ 315.

Section 10(b) forbids (1) the use of any "deceptive device" (2) "in connection with the purchase or sale of any security" and (3) "in contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b). SEC Rule 10b-5, in turn, makes it unlawful to (a) "employ any device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact," or (c) "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5.

The plaintiffs' Count One alleges violations of Section 10(b) and Rule 10b-5. ACC ¶¶ 308-17. First, they

allege that defendants made material misrepresentations and omissions regarding the firm's organic growth potential, among other subjects, in violation of Rule 10b-5(b). *See* ACC ¶¶ 102, 200. Second, plaintiffs contend that defendants engaged in a "scheme" to defraud investors regarding the firm's promised organic revenue growth, in violation of Rule 10b-5(a) and (c). *See id.* ¶¶ 102, 151. We take up these two categories of claim — misrepresentations and omissions, and scheme liability — in that sequence.

## A. Material Misrepresentations or Omissions Claim

### 1. Legal Standard Under Rule 10b-5(b)

Subsection (b) of Rule 10b-5 deals with misrepresentations and omissions. To state a claim under that subsection, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). An actionable statement may be "'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).

Clarivate moves to dismiss plaintiffs' 10b-5(b) claim on the grounds that the complaint fails to adequately plead that any defendant made an actionable misrepresentation or omission. *See* Clarivate Mem. 3, ECF No. 73-1. The alleged misrepresentations fall into several broad categories: (1) the organic growth projections themselves; (2) assurances that Clarivate was "on track" to meet its projections; (3) reports of Annualized Contract Value growth; (4) reports of revenue backlog; (5) representations that Clarivate's transactional business was seasonal, weighted to the fourth quarter; (6) statements that investments in products were contributing to revenue growth; and (7) statements omitting that the transition to an "inside sales" model would have a negative impact on Clarivate's ability to grow its revenues. We address each category in turn, before proceeding to consider scienter as to any actionable misrepresentations.

2. <u>Alleged Misrepresentations or Omissions</u>

a. Organic Growth Projections

Plaintiffs allege that Clarivate's organic growth projections were false when made, for several reasons — for example, because the defendants were allegedly aware that the company was struggling to convert invoiced sales into revenue. ACC ¶ 207(b)-(c). Defendants respond that these projections are inactionable under the PSLRA safe harbor for forward-looking

statements, as they were accompanied by meaningful cautionary language. *See* Clarivate Mem. 32-35. The Court agrees.

Clarivate's organic-growth projections were "forward-looking" within the meaning of the applicable safe harbor. The PSLRA defines a forward-looking statement to include "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." 15 U.S.C. § 78u-5(i)(1)(C). Here, plaintiffs point to statements regarding future economic performance, such as Stead's November 10, 2020 comment that "I said in January of 2019 . . . that we would exit 2020 at 4% to 6% organic. . . . I expect us to end in that 4% to 6%." ACC ¶ 206.

These statements about expected organic revenue growth qualify as forward looking, even if — as here — some were made relatively close to the measurement date for the projection at issue. In *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 540 (S.D.N.Y. 2024), for example, the court held that a press release estimating earnings was forward looking, despite being issued after the quarter in question had closed (but before results had been tabulated). Here, it would not have been possible on November 10 to *know* what the "exit-growth" rate would be seven weeks later. *See, e.g.*, *Harris v. IVAX Corp.*, 998 F. Supp. 1449, 1453 (S.D. Fla. 1998) ("[T]he representations

are made mid-quarter, before the calculations businesses use to quantitatively evaluate their financial well being are completed.”), *aff’d*, 182 F.3d 799 (11th Cir. 1999); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (holding that the “critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made”).

Under the PSLRA’s safe harbor, a forward-looking statement is not actionable if it is (a) “identified and accompanied by meaningful cautionary language,” (b) “is immaterial,” or (c) “the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.” *Vivendi*, 838 F.3d at 245. “Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.” *Id.* at 245-46.[17]

[17] One might reasonably expect otherwise — that even “meaningful cautionary language” would not save a forward-looking projection that the speaker “actually knew” to be false (that is, a projection that the speaker knew for a fact the company could not possibly meet). This rule prevails in the Fifth Circuit. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) (“Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations [at issue].”) But *Vivendi* (and *Slayton*, which it relied on) appear to foreclose this alternative reading. *See Vivendi*, 838 F.3d at 245-46; *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 771 & n.7 (2d Cir. 2010) (legislative history of the PSLRA “makes quite plain” that Congress did “not want courts to inquire into a defendant’s state of mind,” that is, “a defendant’s knowledge of the risks at the time he made the statements”).

The forward-looking statements at issue here were accompanied by meaningful cautionary language. To be meaningful, cautionary language must not be "boilerplate" and must "convey[] substantive information." *Id.* at 247. A defendant must identify in the cautionary language "important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A). In its 10-K for fiscal year 2020, Clarivate disclosed that all "projections" contained therein constituted forward-looking statements that might "be materially different from" actual results due to certain risks. The company specifically flagged the organic-growth metric, noting that it might be unable "to derive fully the anticipated benefits from organic growth." 2020 10-K 23. In the "Risk Factors" section of the 10-K, Clarivate pointed to certain reasons *why* that might be the case. These included potential difficulties with "maintain[ing] and / or achiev[ing]" "broad market acceptance" of the company's products. *Id.* at 21. The company also flagged its potential "inability to attract and retain[] key personnel," including in "sales, marketing, [and] product development" roles. *Id.* at 21-22.

These disclosed risks match — quite closely — the reasons why plaintiffs say Clarivate actually failed to reach its organic- and exit-growth targets. As a reason for the

company's alleged failure to maintain market acceptance, the plaintiffs blame Clarivate's decision to forego "an opportunity to invest in [its] products." *See* ACC ¶ 288 (alleging that after foregoing that opportunity, Clarivate "lost numerous customers"). The plaintiffs also blame Clarivate's failure to meet projections on its inability to retain key sales personnel. *See id.* ¶ 238 (Clarivate's "restructuring plans, reduction of the outside sales force, and the shift to an inside sales model had a negative impact on Clarivate's revenue-generating capabilities and eventually caused its revenue trends to decline"). This is what the safe harbor requires. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 225 (S.D.N.Y. 2022) (cautionary language was meaningful because it "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, and directly related to the risk that brought about plaintiffs' loss").

And Clarivate regularly flagged such cautionary language. On earnings calls and at presentations (like the November 2020 call from which CEO Stead is quoted above), speakers noted that they might make forward-looking statements, and referred listeners to Clarivate's SEC filings for more detail on risks and uncertainties. *See* 15 U.S.C. § 78u-5(c)(2)(B) (oral projections may be accompanied by cautionary

statements that refer to listeners to written documents for additional information); *e.g.*, Clarivate Plc, Ex. 99.1 to Current Report (Form 8-K) (Nov. 10, 2020) (November 2020 call materials); Weinstein Decl. Ex. D, at 6, ECF No. 73-6 (transcript of Q3 2020 earnings call); Weinstein Decl. Ex. S, at 3, ECF No. 73-21 (slide from 2021 Investor Day presentation).

Plaintiffs contend that this language was not meaningful because Clarivate failed to warn investors of "exactly the risk that plaintiffs claim was not disclosed": that the "organic revenue growth projections were unrealistic." *See* Pls.' Opp. to Clarivate 19, ECF No. 73-22. Plaintiffs also argue that the cautionary language was misleading because it said only that Clarivate "may" miss organic revenue targets, when those targets were actually "unachievable." *Id.*

We can easily dispose of the plaintiffs' claim that Clarivate failed to disclose the risk that the company's growth projections "were unrealistic." Clarivate's obligation was to disclose the business and economic factors that might cause results to fall short — not the generic risk that their projections might be unrealistic. It would be odd, to say the least, to require a corporate executive to "caution" that her projections should be treated as unrealistic. Here, the Clarivate Defendants' task was to warn about the risks in growing the business organically, and their cautionary language

did do that. Thus, Clarivate's cautionary language was meaningful, and the forward-looking statements regarding organic growth are protected by the PSLRA safe harbor.[18]

b. Progress Toward Organic Growth Projections ("On Track" Statements)

Plaintiffs also argue that Clarivate's statements about *progress* toward growth projections, like Clarivate being "on track," were misleading. Plaintiffs argue that these statements do not fall under the PSLRA safe harbor, as they contained misstatements of *present* facts and thus were not forward looking. The Court disagrees.

The Second Circuit has recognized that a statement "may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." *Vivendi*, 838 F.3d at 246. Where the forward-looking elements are sufficiently specific — and therefore severable — they may be actionable. *See In re Supercom Inc. Sec. Litig.*, No. 15-CV-9650, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) ("Mixed present and future statements are not entitled to the safe harbor with respect to

[18] The plaintiffs also argue that statements relaying organic revenue growth projections were misleading because they omitted information about the departure of "key talent" and a decrease in product quality. *See* Pls.' Opp. to Clarivate 13. The PSLRA safe harbor does not protect material omissions. *Turquoise Hill*, 625 F. Supp. 3d at 217 n.17. However, plaintiffs here are merely "recharacteriz[ing] their false-statement claims as material-omission claims," which is unavailing, because to find "[o]therwise, the PSLRA would have no force." *Id.*

the part of the statement that refers to the present."). But "when the present-tense portion . . . does not provide *specific* information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." *Turquoise Hill*, 625 F. Supp. 3d at 211 (emphasis added); *see also Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (claims that a company was "on track" to meet projections, "when read in context," could not "meaningfully be distinguished from the future projection of which they [were] a part").

Here, there is no sufficiently specific, severable present-tense component in the statements at issue. As an example, plaintiffs point to Stead's April 2021 comment: "[O]ur first quarter results demonstrate that we are absolutely on the pathway to achieving 6% to 8% organic growth exiting 2021. . . . We're on track to do what we've said we're going to do." ACC ¶ 211(b). A severable projection might say: "we expect to meet our year-end earnings goal because, *halfway through the year, we've already exceeded 50% of that goal.*" The italicized component is of course about the present, not future. But that is not the kind of statement at issue here: all Clarivate said was that it was "on track" to meet a year-end goal — an "exit-

growth" rate goal, specifically, that would not be falsifiable until the year had ended.[19] Thus, the present component of this statement cannot be isolated.

Indeed, courts in this Circuit have consistently held that statements about being "on track" fall within the PSLRA's safe harbor. *See, e.g.*, *Villare v. Abiomed, Inc.*, No. 19-CV-7319, 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21, 2021) (agreeing with "other courts in this District [that] have held that language stating that a company was presently on track with its projected goals was forward looking under the PSLRA"); *see also Turquoise Hill*, 625 F. Supp. 3d at 210-11 (statements that project was "on track" and "on schedule" were protected).

The cases on which plaintiffs rely do not compel a contrary conclusion. In *Vivendi*, for example, one statement ran as follows: "Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves . . . ." 838 F.3d at 246. The panel explained that "there is nothing prospective about the

[19] The "on track" statement also cannot be evaluated for its present truth without knowing something about the actual distribution of Clarivate's revenues over the course of a year. A seller of Christmas trees, by way of example, might pronounce its yearly revenue to be "on target" in July, but if that seller typically earns 95+% of its income in November and December, the projection would contain relatively little *current* factual content. Here, the complaint itself indicates that Clarivate's revenues were historically back-loaded to the fourth quarter. *E.g.*, ACC ¶ 236.

representation that Vivendi entered 2001 with a 'very strong balance sheet,' which Plaintiffs argued . . . was part of what made [the] statement misleading." *Id.* The statement at issue here contains no analogue to that current component, as the plaintiffs are not challenging Clarivate's first quarter 2021 results. ACC ¶ 211. Thus, statements about progress toward organic growth projections are protected by the PSLRA safe harbor.

c. ACV Growth

Plaintiffs allege that defendants materially overstated Annualized Contract Value *and ACV growth* by including "incomplete sales" — that is, deals with customers who never actually agreed to pay — in the metric. In turn, they say, defendants used the inflated ACV metric to support their organic growth projections. Contrary to defendants' argument, these statements are plausibly misleading, as plaintiffs have alleged in some detail the basis for their assertion that Clarivate's ACV figures were inflated. And these statements are neither covered by the safe harbor nor opinions. Thus, the motion to dismiss will be denied as to these alleged representations.

The defendants argue that the allegations about ACV do not make any statement false or misleading. Specifically, they contend that the complaint fails to specify (a) how often sales were logged prematurely, (b) the degree to which (and period in

which) ACV was overstated, and (c) when (or if) the market learned of any misstatement. Clarivate Mem. 29. They also contend that the complaint leaves a gap between CW-6's statement that invoices were missing information and the conclusion that this was so because those invoices reflected incomplete sales. *See* Clarivate Suppl. Ltr. 2.

As articulated above, Rule 9(b) and the PSLRA create a heightened pleading standard. But plaintiffs need not plead facts beyond those required: the speaker of each allegedly fraudulent statement, where and when it was made, and why the statements were fraudulent, generally speaking. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Here, plaintiffs plead all information required. *See, e.g.*, ACC ¶¶ 217-218. Most importantly, plaintiffs have adequately alleged falsity. They plead that the defect in ACV was rooted in Clarivate's customer relationship management ("CRM") systems. *Id.* ¶¶ 126-129, 152. Salespeople used CRMs, like Salesforce, to track sales data. *Id.* ¶ 126. Salespeople prematurely reported sales as "closed" therein. *Id.* ¶¶ 152, 159. "[T]hese incomplete sales would then be sent to [Clarivate's] Invoice Review Desk . . ., which would flag the invoices for failing to meet quality control parameters . . . ." *Id.* ¶ 152. Despite the flag, Clarivate invoiced counterparties, and these incomplete sales were included in calculating ACV. *Id.* ¶ 153.

Plaintiffs support these claims with allegations by a CW. According to CW-6, Clarivate "pushed through" "hundreds" of flagged invoices for collection. *Id.* ¶¶ 157-158. These invoices were "incomplete": they were based on "disorganized notes" and did not reflect committed sales. *Id.* ¶¶ 156-157. Kathy Sullivan, Chief Tax and Revenue Operations Officer, told employees to push invoices through, because CFO Hanks "wants to make our forecast, so [we] have to make numbers, and need revenue." *Id.* ¶ 157. While these putative sales contributed to ACV, "only about 30%" of invoices "were ever paid." *Id.* ¶ 158. Plaintiffs also explain that missing information on invoices meant incomplete sales: the sales in question often lacked "purchase order[s] from" customers. *Id.* ¶ 152. And plaintiffs contend that the market learned of the misleading nature of the ACV statements when Clarivate reported disappointing revenue not reflecting previously reported ACV. *See id.* ¶¶ 169-171, 197. Plaintiffs have thus adequately pled that these ACV statements were misleading.

Clarivate argues that plaintiffs may not rely on CW-6 because the complaint does not "provide facts suggesting that" he or she "ha[d] a basis to know" the ACV statements were false or misleading. Clarivate Suppl. Ltr. 2. Given Rule 9(b), the complaint must provide particularized factual content about such a source — enough "to support the probability that a person in

the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Plaintiffs have done so. CW-6 was the Director of Clarivate's "Order to Cash department" between October 2020 and September 2022. ACC ¶¶ 154, 292. This department was "generally responsible for all of the steps involved" between a sale and payment, "from processing an order through [to] when payment [was] received and applied to accounts receivable." *Id.* ¶ 154. CW-6 managed 200 employees via eight direct reports, responsible for collections, billing, invoicing, and cash posting. *Id.* ¶ 292. CW-6's supervisor was Sullivan, the Chief Tax and Revenue Operations Officer, who first reported to CEO Stead, and later to the CFO. *Id.* At this stage, the Court credits CW-6's allegations regarding invoicing practices.

Clarivate also argues that its ACV claims, too, are protected by the safe harbor for forward-looking statements. *See* Clarivate Ltr. Br. 2-3, ECF No. 106. But unlike, for example, the organic growth projections, the statements about ACV did look backward. By Clarivate's own definition, the metric assumed clients renewed "*expiring* license agreements" at the "current price level." ACC ¶ 120 (emphasis added); *see* *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 335-36 (D.D.C. 2005) ("[I]ndicating that a contract has been signed is not a forward-looking statement . . . .").

Finally, Clarivate argues that these statements are inactionable opinions under *Omnicare*. *See* Clarivate Ltr. Br. 3. This is not correct. A "statement of fact expresses certainty about a thing, while a statement of opinion does not." *New Eng. Carpenters*, 122 F.4th at 40. "Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty . . ., mark[ing] the statement as reflecting the speaker's impression or point of view rather than an objective truth . . . ." *Id.* And the statements at issue were objective. CFO Hanks informed investors, for example, that "ACV growth on an ongoing basis increased by almost 5% and was driven by organic growth and annual price increases." ACC ¶ 202(a). This statement "expresses certainty" about both the extent of ACV growth and the reasons for it. *New Eng. Carpenters*, 122 F.4th at 40. Therefore, the comments about ACV are actionable.

d. Q4 2021 Bump (Seasonality)

Plaintiffs also allege that Clarivate represented throughout 2021 that revenues in its life sciences business remained weighted to the fourth quarter. This back weighting was characteristic of DRG, the company Clarivate acquired in 2020. By the fourth quarter of 2021, however, the defendants had stated publicly that they had completed transitioning much of DRG's transactional revenue to less seasonal, subscription-

based revenue. ACC ¶ 176. Hence the falsity: even after this transition, Clarivate continued to maintain — without a basis — that DRG would continue to see a fourth quarter revenue bump. *E.g.*, *id.* ¶¶ 178, 191. Here, the complaint sufficiently alleges that the statements were misleading.

CW-3, who joined from DRG, explained that the transition meant that "certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year." *Id.* ¶ 177; *see also id.* (CW-2 reporting that "some [fourth-quarter] business was lost" because of the "attempts to transition this business to a subscription model"). Ultimately, Clarivate's total "revenue split [including, but not limited to, DRG] between the first [and] second half of the year in 2021 was 49% vs. 51%," rather than "earlier assurances of 47% vs 53%." *Id.* ¶ 245. One analyst reported that "weakness [in Clarivate's results] was likely due to lower than expected DRG transaction[al] revenues." *Id.* ¶ 196; *see Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 16-CV-3591, 2020 WL 1877821, at *1 (S.D.N.Y. Apr. 14, 2020) (statement that company was experiencing "strong demand" misleading after defendants "engage[d] in sales tactics designed to inflate [the company's] short-term sales figures").

Clarivate argues that it did, in fact, disclose the shift from transactional to subscription sales. It finds some support for this assertion in the complaint itself. In one example, Ahmed noted on a conference call in December 2021: "[W]hat we've done [is] . . . move [DRG] more into a Data-as-a-service offering. . . . So it's not a one-time transactional deal in Q4 . . . . [Revenue] becomes equalized through the year . . . ." ACC ¶ 176.

But Clarivate's statements on this issue pointed in multiple directions. The company continued to make seasonality-driven assertions, including when asked specifically about this issue. For example, an analyst asked during the Q2 2021 earnings call "if there's a pull forward or a shift" caused by "something changing operationally." *Id.* ¶ 181. Stead denied any shift: "What you should have heard from my comments was Q3 will be pretty close to where we [were] with Q2. *And Q4 will be very strong as we exit.*" *Id.* On that same call, Stead highlighted the back-loading of DRG's revenue, noting:

> As an important reminder, 60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter. . . . Additionally, transactional revenue is seasonally strongest in the fourth quarter. These items together will drive our [exit] organic growth rate into the upper end of our 6% to 8% target.

*Id.* ¶ 186; *see also id.* ¶ 191 ("[R]emember, Q4, 36% of total DRG revenue comes into Q4 . . . most" being "heavy transaction."

(November 2021 comment by Stead)). The allegations leave this issue disputed (at least), at this stage, making dismissal premature. *See, e.g.*, *SEC v. Westport Cap. Mkts. LLC*, 408 F. Supp. 3d 93, 104-05 (D. Conn. 2019) ("internally contradictory" disclosures insufficient).[20]

Finally, Clarivate argues that the CWs' allegations are facially incredible, as neither CW remained at Clarivate through Q4 2021. Clarivate Mem. 29. But that is not the relevant period: the point is that, because the alleged pull-forward of DRG revenue occurred prior to Q4 2021, *see, e.g.*, ACC ¶¶ 234-237, they were in a position to understand why the later statements were *false*, even if they were hearing those statements after their employment ended.[21]

e. Revenue Backlog

In a similar vein, the plaintiffs next challenge the defendants' statements favorably characterizing Clarivate's backlog. *See, e.g.*, *id.* ¶¶ 151-52. The plaintiffs describe this backlog as including "orders and contracts received for

[20] Because we conclude that these claims are actionable, we need not reach the import of Item 303.

[21] Additionally, these CWs are described with enough "particularity to support the probability" that those in their roles "would possess the information alleged," all that is required to credit their accounts. *Blanford*, 794 F.3d at 305. Specifically, CW-2 was a Senior Director, Data Analytics at DRG and then Clarivate from 2017 to April 2021. ACC ¶ 288. CW-2 frequently worked with clients and engineers to implement new product features. *See id.* CW-3 was a Key Account Director, Strategic Partnerships at DRG and then Clarivate from June 2016 until October 2021. *Id.* ¶ 289. They worked to identify new business opportunities and strategies. *See id.*

which performance has not occurred . . . ." *See id.* ¶ 118 (quoting Clarivate's 2021 10-K).

However, the ACC includes only a single purported misstatement that includes the word "backlog" — a comment by Ahmed about expected Q4 2021 revenues from DRG:

> We have a consulting backlog that we typically deliver in Q4. . . . We have direct insight into the backlog. And going into Q4, that backlog is pretty strong as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue.

*Id.* ¶ 189. To the extent this statement is actionable, it is because of the misrepresentations about DRG's expected Q4 revenues (discussed above), not because of distortions of the unquantified "backlog" metric. The plaintiffs' "backlog" theory thus adds no actionable misstatements.

f. New Product Development and Investment

The plaintiffs also allege that the defendants' statements that "the quality of [Clarivate's] product offerings" were contributing to growth — or at least greater "retention" of customers — were false. *Id.* ¶¶ 220-225. They challenge, for example, CFO Hanks' statement (on a "Q2 2020 conference call") that Clarivate was "enjoying the benefits of the product renovations *flowing through to even higher renewal rates*." *Id.* ¶ 220 (emphasis in complaint). Likewise, Hanks announced at the company's 2021 Investor Day that, in "our near-term outlook, we

see our renewal rates increasing" by "at least 100 basis points" over the prior year, and attributed that outlook to "the continued investment we've made in products." *Id.* ¶ 223.

These statements were false, plaintiffs allege, because Clarivate had not actually "invested in new products that could drive" revenue growth and the "quality of Clarivate's existing products [had] declined due to a lack of investment." *Id.* ¶ 225. Rather than leading to new sales or greater retention of existing customers, this failure of investment was "negatively impacting revenue growth." *Id.*

To the extent that plaintiffs are claiming these statements were false simply because Clarivate's revenue growth was inflated, they are addressed above. But the complaint is more specific on this point: it alleges that Clarivate's revenue growth was "negatively impacted" by the company's failure to provide "sufficient additional value through improved product offerings" at the same time that it was "rais[ing] prices." *Id.*

This allegation still fails because the plaintiffs have not adequately alleged the needed causal connection — specifically, that any CW (or, perhaps, anyone else) was in a position to know the extent to which product investments were driving, or would drive, revenue growth. Four of the CWs were sales representatives (CW-1, CW-3, CW-4, and CW-5), *id.* ¶ 128, and one led the "Order to Cash" Department (CW-6). *Id.*

¶ 154. The complaint offers no basis to conclude that the CWs were positioned to know how changes in the quality of Clarivate's product portfolio might affect growth. CW-2, a Senior Director of Data Analytics, had some responsibility for "monitoring the quality of . . . product offerings." *Id.* ¶ 288. While CW-2 stated that he saw product quality fall, CW-2 is not alleged to have any insight into how deterioration would affect revenue growth. The plaintiffs therefore have not plausibly pled that these statements were materially misleading.

g. Transition to an Inside Sales Force (Item 303)

The plaintiffs also seek to hold the defendants liable for their failure to disclose certain "trends" as required under Regulation S-K, Item 303. Though they do not define it with precision, one such trend is the effect of Clarivate's shift to an inside sales force — that is, the use of call centers instead of "outside" field sales agents.

Item 303 of Regulation S-K requires filers to spell out "known trends or uncertainties that the registrant reasonably expects will have a material unfavorable impact on revenues or income from continuing operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citing 17 C.F.R. § 229.303(a)(3)(ii)). Filers must also disclose the "manner in which [the trend] might reasonably be expected to

materially impact a company's overall financial position." *Id.* at 105.

The plaintiffs appear to be asserting that an Item 303 violation is separately actionable. *See* Pls.' Opp. to Clarivate 28 (contending that the omissions in question "give rise to Item 303 liability"). It is not; Item 303 "itself does not support an independent cause of action." *Rein v. Dutch Bros., Inc.*, No. 23-CV-1794, 2024 WL 3105004, at *6 (S.D.N.Y. June 24, 2024) (citing *Stratte-McClure*, 776 F.3d at 101-02)). Instead, "the failure to disclose information required by Item 303 can support" a claim under Section 10(b) and Rule 10b-5 — but "only if the omission [to say what Item 303 requires] renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024).[22] Following *Macquarie*, a company's total silence on a given trend is not redressable in a private securities action, even if it violates Item 303. Instead, the omission must render statements actually made misleading by its absence. *Id.* As described below, the statements the plaintiffs allege were misleading by omission are not actionable.

[22] This misapprehension leads, in turn, to them invoking the wrong materiality standard. Pls.' Opp. to Clarivate 28 (referring to Item 303's requirement to disclose trends that are "*reasonably likely* to be material"); *see generally Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (observing that the materiality standards for Rule 10b-5 and Item 303 "differ significantly").

Reading the complaint generously (to the plaintiffs), we can identify certain statements that might *arguably* give render the omission to disclose the inside-sales trend misleading (even if the plaintiffs do not identify such statements themselves). For example, Stead stated that Clarivate had "abundant opportunities" to cross-sell or upsell its products. ACC ¶ 242. The plaintiffs allege that Stead's touting the cross-selling opportunities was misleading because the inside-sales shift resulted in Clarivate lacking the necessary personnel to do so. *Id.* ¶¶ 238, 239.

Even framing the claim in this way, plaintiffs have not sufficiently alleged why these statements are misleading by omission. For one, the complaint does not make the necessary logical connection between the inside-sales transition, on the one hand, and any concrete impact on cross-selling, on the other. While the complaint cites the company's disclosure of a "reduction in workforce," that disclosure did not indicate which part of Clarivate's sales team was affected. *Id.* ¶ 231. The complaint does allege, via CW-4, a sales representative, that Clarivate fired "numerous field sales people." *Id.* ¶ 290. CW-4 also asserts that Clarivate "failed to backfill vacated positions in the sales force," and that employees hired for the inside sales force were "ineffective rookies." *Id.* But this level of generality does not suffice, absent some specifics

regarding how many field agents were terminated, how many inside salespeople were hired to replace them, and what quantum of sales may have been lost as a result.

Clarivate did ultimately recognize "staffing gaps" and "sales force" vacancies "late in [2021]" in explaining why it missed its growth targets. *Id.* ¶ 248. But the challenged statements — ranging from January 2020 to February 2021 — long pre-date "late" 2021. *See Rombach*, 355 F.3d at 174 ("[W]ithout *contemporaneous* falsity, there can be no fraud . . . ."). And "the fact that [Clarivate] decided to pursue another strategy does not make its earlier statements false." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 646 (S.D.N.Y. 2015).

* * *

As to the actionable conduct described above, only the "makers" of these statements may be liable. *See Janus Cap. Grp, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). As to written documents, signers of a misleading document, and the entities on whose behalf they signed, are makers of the statements in the document. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262–63 (S.D.N.Y. 2020) (collecting cases and applying *Janus*). To be liable, any maker must have acted with scienter, which we consider next.

**B. Scienter**

1. Standard Under Section 10(b) and Rule 10b-5

"In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). The required state of mind — scienter — is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (reading the term "manipulative . . . device" to "connote[] intentional or willful conduct designed to deceive or defraud investors"). An inference of scienter is strong only when it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Given that *direct* proof of a defendant's state of mind is uncommon, "scienter can be established by alleging facts to show either" (1) strong circumstantial evidence of conscious misbehavior or recklessness[23] or (2) that defendants had the

[23] While the applicable standard refers to "conscious misbehavior or recklessness," *ECA*, 553 F.3d at 198, the case law sometimes treats the two phrases as synonymous. *See, e.g.*, *In Re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) ("To survive dismissal under the 'conscious

motive and opportunity to commit fraud. *ECA*, 553 F.3d at 197-98. Scienter can be imputed to the corporation if an officer or director of the corporation committed a culpable act with scienter. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (per curiam).

2. Plaintiffs Plausibly Allege Scienter for Jerre Stead, Richard Hanks, Mukhtar Ahmed, and Clarivate Itself

a. Jerre Stead

Following the determinations above, only two categories of statements by CEO Stead remain at issue. The first category is statements contained in SEC filings — on Forms 10-Q and -K — ascribing a percentage to Annualized Contract Value growth. *See, e.g.*, ACC ¶ 202(b). The second category includes statements describing DRG's revenues as continuing to be "seasonal[]" — for example, his statement on the Q2 2021 earnings call that, "[a]s an important reminder, 60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter." *Id.* ¶¶ 185-186. This seasonality, he claimed — falsely, according to plaintiffs — would help "drive our organic growth rate into the upper end of our 6% to 8% target rate exiting 2021." *Id.* As described above, the

misbehavior' theory, the appellants must show that they alleged *reckless conduct* by the appellees . . . ." (emphasis added)); *Kalnit v. Eicher*, 85 F. Supp. 2d 232, 243 n.5 (S.D.N.Y. 1999) ("Although courts often refer to 'conscious misbehavior' or 'recklessness,' the terms appear to be legally interchangeable.").

plaintiffs have sufficiently alleged the falsity of these statements. We thus consider Stead's scienter as to each.

Plaintiffs allege no direct evidence of Stead's knowledge. Rather, they contend that they have adequately alleged scienter by pleading his motive and opportunity, as well as recklessness. We begin first by considering motive and opportunity. Where, as here, the relevant defendants are all "corporations, corporate officers, and corporate directors," "courts often assume" that the defendants "would have the opportunity to commit fraud if they so desired." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006). In such cases, under the "motive and opportunity" rubric, plaintiffs can establish a strong inference of scienter if their "complaint sufficiently alleges that the defendants . . . benefitted in a concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

The complaint fails to do so. As to both categories, plaintiffs contend that they have adequately alleged Stead's motive by pointing to his "incentive to perform inadequate due diligence" as a SPAC sponsor. Pls.' Opp. to Clarivate 31. Plaintiffs argue that Stead needed to "gin up investor interest" in a de-SPAC transaction. *Id.* But any such motive "dissipated once the de-SPAC transaction was complete." *In re Lottery.com*,

*Inc.*, 715 F. Supp. 3d at 555. And the putative class period does not start until months *after* the de-SPAC transaction. At that time, Stead was, for our purposes, a public company CEO like any other.

Because plaintiffs have not sufficiently alleged motive, the dispositive question is whether they have plausibly alleged conscious misbehavior or recklessness for each set of misstatements or omissions.

***Annualized Contract Value Growth.*** Plaintiffs bring various theories to allege Stead's recklessness as to ACV. Whether considered separately or together, these theories fail. Plaintiffs first contend that Stead was a "hands-on" manager who paid close attention to organic revenue and growth. Pls.' Opp. to Clarivate 33. But "simply alleging that executive defendants are closely involved in running their business is not enough" to establish scienter. *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021). Plaintiffs also point to allegations that Stead reviewed sales reports each week, and to "executive management" meetings with the CWs regarding financial data and customers' activities. Pls.' Opp. to Clarivate 35-36; ACC ¶¶ 255, 292. But the complaint does not indicate whether these reports included any information about ACV. *See id.* ¶ 255 (describing reports reviewed by Stead but excluding any mention of ACV). Nor does the complaint "specify

whether [Stead] was actually involved" or present at the CWs' meetings with "executive management" or "C-Suite executives." *See United States v. Strock*, 982 F.3d 51, 66-67 (2d Cir. 2020) (applying analogous False Claims Act requirement of "strong inference of fraud"); *see, e.g.*, ACC ¶ 292 (using these terms but not specifying Stead's involvement).

Plaintiffs' invocation of the "core operations doctrine" is similarly unavailing. A "core operation" is one that "constitute[s] nearly all of a company's business." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019). Under that doctrine, where a defendant made false or misleading statements about core operations of a company, a showing that a defendant knew or should have known about "contradictory facts of critical importance to the company" supports an inference of scienter. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). Here, the complaint alleges that Clarivate miscalculated ACV because of issues affecting "hundreds of invoices." ACC ¶ 257. Yet Stead claimed Clarivate had "13,000+ customers" in November 2019. *Id.* ¶ 139. The invoicing issues

therefore did not affect "nearly all" of Clarivate's business.[24]

Plaintiffs also point to the proximity between the final alleged ACV misstatements (in October 2021) and the corrective disclosure — Clarivate's updated growth projections on February 3, 2022. Pls.' Opp. to Clarivate 37. But temporal proximity "is too ephemeral a connection to raise a strong inference of scienter." *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015), *aff'd sub nom.*, *Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016).

Relatedly, plaintiffs point to the "magnitude" of the Restatement. Pls.' Opp. to Clarivate 42. This fact has an obvious "nonculpable explanation": as described above, the Restatement concerned how Clarivate accounted for its mergers with DRG and CPA Global — not any issues related to ACV. *Tellabs*, 551 U.S. at 314; *supra* Section I.C.

Finally, contrary to plaintiffs' argument, Stead's Sarbanes-Oxley certifications are insufficient. Pls.' Opp. to Clarivate 42. Stead purportedly "certified" he had "undertaken an assessment and evaluation of the Company's disclosure controls to ensure that [Clarivate's] SEC filings did not contain any false information" and that these controls were in

[24] Moreover, it is an open question in the Second Circuit whether the core operations doctrine can ever establish scienter after the PSLRA. *See In re Lottery.com, Inc.*, 715 F. Supp. 3d at 557.

part "designed to ensure all relevant and material information is reviewed by Stead" before such certification. ACC ¶ 268. Such certifications "cannot raise an inference of fraudulent intent . . . without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases); *see also Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (no scienter despite, among other allegations, defendants submitting "false Sarbanes-Oxley certifications . . . without additional, concrete allegations of fraudulent intent"). The plaintiffs have thus failed to allege Stead's scienter as to these ACV statements.

***DRG Seasonality.*** The plaintiffs have, however, adequately alleged recklessness as to Stead's statements regarding the seasonality of DRG's revenues. Plaintiffs may allege recklessness by alleging that Stead "knew facts or had access to information suggesting that [his] public statements were not accurate." *ECA*, 553 F.3d at 199. "Where," as here, "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. Plaintiffs have done so. CFO Hanks publicly commented that he and Stead received weekly data indicating what DRG had "sold and

contracted for delivery," and compared that data "to the same period [the] prior year." ACC ¶ 255 (March 2021 earnings call comment); *see San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024) (scienter adequately pled as "Defendants' own statements suggest that they had access to — and reviewed . . . information [containing contrary facts].").

Clarivate also publicly announced that it would restructure DRG's business, allowing the inference that Stead was generally aware of this initiative. At the January 17, 2020 conference call announcing the DRG acquisition, for example, Hanks (with Stead on the line) announced that "We have a plan to, over time, migrate some of the reoccurring and onetime revenues onto a platform capability, which will be subscription-based." ACC ¶ 175. These circumstantial "allegations that [Stead] had actual knowledge that [his] statements were false or misleading are sufficient to plead scienter." *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 441 (S.D.N.Y. 2025).

The complaint includes at least one other allegation that supports the strong inference of scienter. Stead responded to an analyst who specifically asked about seasonality, telling him that "Q4 will be very strong as we exit." ACC ¶ 181. That Stead "placat[ed]" an analyst's concerns "provides cogent

support." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017).

The defendants argue there is an "equally strong" inference that any "declines in revenues were simply a temporary result of the Company's initiatives to strengthen the business." Clarivate Mem. 16. But even if we drew this inference, dismissal would be inappropriate: the plaintiffs' inference need only be "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

b. Richard Hanks

Two categories of statements by CFO Hanks remain at issue. The first category are statements contained in SEC filings — on Forms 10-Q and -K — as well as on conference calls ascribing a percentage to Annualized Contract Value growth. *See, e.g.*, ACC ¶¶ 202(a), 214(a). Unlike Stead, Hanks also described this percentage on conference calls, and provided further detail, such as the amount of *organic* ACV growth. *See, e.g.*, *id.* ¶ 214(a). The second category includes statements describing DRG's revenues as continuing to be "seasonal[]" — for example, his statement at an investor conference on November 17, 2021 that, DRG "has a significant back-end loading of revenue into Q4." *Id.* ¶¶ 214, 216. As described above, the plaintiffs

have sufficiently alleged the falsity of these statements. We thus proceed to consider scienter as to each.[25]

***Annualized Contract Value Growth.*** As to ACV growth, the plaintiffs have alleged that Hanks "knew facts or had access to information suggesting that [his] public statements were not accurate." *ECA*, 553 F.3d at 199. The plaintiffs have provided specific allegations about the source of these facts. Unlike Stead, Hanks received "a monthly tracking report of cash collections which detailed clients that were not paying their bills" from CW-6. ACC ¶ 260. Hanks had allegedly "asked CW-6 to look into the collection and invoicing issues at [a] face-to-face meeting in early 2021." *Id.* ¶ 292. CW-6 "report[ed] the results" of his or her inquiry to Hanks, explaining that "a significant reason for the lack of payments was 'because [Clarivate was] not invoicing them correctly.'" *Id.* ¶ 263. Hanks also met "face-to-face" with CW-6 regarding these issues "throughout 2021." *Id.*; *see In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 247 (S.D.N.Y. 2023) (scienter adequately pled, as "reports from a confidential witness support that Defendants . . . participated in numerous meetings during which the problems with hiring, productivity, turnover, and . . . underperformance relative to [the company's] forecasts were

[25] Because we conclude that plaintiffs have adequately alleged Hanks' recklessness as to each set of statements, we need not reach motive and opportunity.

discussed"). CW-6 later sent "accounts receivable report[s]" weekly, which Hanks received and reviewed. ACC ¶ 259. Plaintiffs thus adequately allege that Hanks knew that invoicing issues affected purported sales, and that some would not convert to revenue; that is, that ACV was being inflated.

Additionally, while the only statements about ACV growth attributable to Stead are those contained in SEC filings, Hanks spoke directly to analysts about the metric. Hanks defined the metric, explaining at the Company's first Investor Day in 2019 that ACV, measured "as a point in time," is "the annualized value of our book of business, of our subscription contracts." *Id.* ¶ 122. Hanks also explained why ACV grew in a given period. *See, e.g.*, *id.* ¶ 202(a) ("[ACV growth] was driven by organic growth and annual price increases."). Hanks' detailed statements about ACV and ACV growth support a finding of scienter. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133-34 (D. Conn. 2021) ("Actively communicating with the public about [the source of revenue growth] . . . is strong circumstantial evidence that [defendant was] receiving some form of specific information about the subject.").

The inference that Hanks knew his statements about ACV were misleading is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

***DRG Seasonality.*** As to statements about DRG, the plaintiffs have alleged Hanks's scienter for the same reasons they have done so as to Stead. Hanks reviewed the same weekly DRG sales data as Stead in 2021. *See, e.g.*, ACC ¶ 255 (March 2021 earnings call comment).

c. Mukhtar Ahmed

As Ahmed did not sign any filings, the only statements he made for which he could be liable are his own statements describing DRG's revenues as continuing to be seasonal. *See Janus*, 564 U.S. at 142. For example, on November 9, 2021, Ahmed stated, "[T]he latter half of the year is where there's typically a pickup [in revenue]. It's a hockey stick effect here in terms of deals coming through in conversion into revenue." ACC ¶ 191.[26]

Plaintiffs have raised a strong inference of recklessness. The plaintiffs have alleged that Ahmed, the head of the group that absorbed DRG, knew (or should have known) that Q4 transactional revenues had been shifted earlier into the year. Specifically, Ahmed spoke to investors during Clarivate's Q2 2020 earnings call about restructuring DRG's business to turn transactional into subscription revenue. *Id.* ¶ 175. And on November 9 and December 7, 2021, Ahmed explained on investor

[26] Because we conclude that plaintiffs have adequately alleged Ahmed's recklessness, we need not reach their arguments as to motive.

calls that this restructuring would shift DRG's revenues earlier into the year. *Id.* ¶ 176. As described above, Ahmed told investors that Clarivate's "invest[ments]" "since we've acquired [DRG]" would change the business "[s]o it's not a one-time transactional deal in Q4 to meet the budgeting cycle . . . . It becomes equalized through the year . . . ." *Id.*; *cf. Alexion Pharms.*, 556 F. Supp. 3d at 133–34 ("Actively communicating with the public about [the source of revenue growth] . . . is strong circumstantial evidence that [defendant was] receiving some form of specific information about the subject.").

Additionally, on one call, an analyst noted, "it's important that DRG does very well in the fourth quarter" and asked for information on DRG's growth "to give us some increased confidence in the fourth quarter performance." ACC ¶ 214(c). Ahmed responded that he had a "line of sight" into DRG's "key deals" in Q4, that is, that he knew what revenue DRG could recognize for the remainder of the year. *Id.*; *see also comScore, Inc.*, 268 F. Supp. 3d at 552 ("placating" an analyst's concerns "provides cogent support for the inference of scienter").

The inference that Ahmed knew his statements about the Q4 bump were misleading is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

* * *

Stead's, Hanks's, and Ahmed's scienter may all be imputed to Clarivate. *See Jackson*, 960 F.3d at 98.

3. Plaintiffs Do Not Plausibly Allege Scienter for Christie Archbold or Sheryl von Bulcher

a. Christie Archbold

The plaintiffs have failed to raise a strong inference of scienter as to Archbold. Archbold signed SEC filings ascribing percentages to ACV growth. The plaintiffs do not make any argument as to Archbold's motive. The only allegations about Archbold, besides that she signed these filings, are that she stepped down from her role in March 2022. ACC ¶ 15. "[A]n officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016).

b. Sheryl von Blucher

The plaintiffs have failed to raise a strong inference of scienter as to von Blucher. Like Archbold, she signed SEC filings ascribing percentages to ACV growth. Plaintiffs make two arguments as to motive, but none as to recklessness. Plaintiffs argue that von Blucher sold 14% of her shares in the June 2021 Offering. ACC ¶ 274. But this is not the type of "unusual insider trading activity during the class period" that "may permit an inference of bad faith and scienter." *Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). In *Acito*, the

Second Circuit held that a director's stock sale was not unusual in part because it amounted to "less than 11% of his holdings." *Id.* And courts have found far larger stock sales to be insufficient to plausibly allege motive. *See, e.g.*, *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (65.6% of the defendant's stake). Plaintiffs also argue that von Blucher — like Stead — was a SPAC sponsor. But as with Stead, any motive "dissipated once the de-SPAC transaction was complete." *In re Lottery.com, Inc.*, 715 F. Supp. 3d at 555.

**C. Scheme Liability Claim**

Plaintiffs also assert a "scheme liability" claim. Scheme liability is premised on deceptive *conduct*, independent of misrepresentations or omissions. *See* 17 C.F.R. § 240.10b-5(a) and (c); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159–60 (2008). This claim is predicated on issues discussed above: issuing invoices for incomplete sales to inflate ACV and backlog, ACC ¶¶ 152-161, and reducing DRG's Q4 2021 transactional sales by converting them into subscription sales to show revenues earlier in the year. *Id.* ¶¶ 174-78; *see* Pls.' Ltr. Br. 3, ECF No. 110.[27]

---

[27] The plaintiffs argue that the defendants did not move to dismiss the scheme liability claims under 10b-5(a) and (c) and have waived the argument. Pls.' Ltr. Br 3. But there has been no such waiver. The defendants moved to dismiss the plaintiffs' "Section 10(b) and Rule 10b-5" claims, not just

To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). A scheme liability claim cannot be premised on "misstatements and omissions alone." *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022); *see also Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-CV-355, 2024 WL 2890968, at *5 n.5 (2d Cir. June 10, 2024) (plaintiff must "clearly identify any deceptive acts distinct from the alleged . . . misstatements and omissions").

Plaintiffs have failed to plead a scheme claim. Plaintiffs' theory of scheme liability relies solely on misstatements: they plead that the defendants' *statements* regarding ACV, backlog, and revenue seasonality were false. As to seasonality, the plaintiffs plead that Clarivate appeared to be recognizing more revenue earlier in the year — but certain defendants misleadingly *stated* otherwise. "The deceptive act is the false statement" itself, such as when Stead denied any pull forward in response to an analyst question. *Turquoise Hill*, 625 F. Supp. 3d at 252; *supra* Section V.A.2.d. As to issuing

10b-5(b) claims, and argued against the theory in their reply brief. Clarivate Mem. 13; Clarivate Reply 2-3, ECF No. 73-23.

incomplete invoices, that conduct, too, was only deceptive "because of a subsequent material misstatement" — the reported amount of ACV — and thus "cannot be shoehorned into a claim for scheme liability." *SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016); *see also In re VNET Grp., Inc. Sec. Litig.*, 804 F. Supp. 3d 426, 439 (S.D.N.Y. 2025) (dismissing scheme liability claim based on "manipulating paperwork" via redactions as duplicative because "these redactions are (part of) the basis on which the Court determined that Plaintiffs have stated a claim under Section 10(b)" as misstatements). "Outside the allegations of the [misstatements, plaintiffs have not] articulate[d] with precision the contours of an alleged scheme to defraud investors." *Eden Alpha CI LLP v. Polished.com Inc.*, No. 22-CV-6606, 2026 WL 673462, at *13 (E.D.N.Y. Mar. 10, 2026) (quoting *Danske Bank A/S*, 11 F.4th at 105).

**VI. Control Person Liability**

Defendants' sole argument for dismissing the Section 20(a) and Section 15 control-person claims is that they require a primary violation of the securities laws, which the defendants argue plaintiffs have not adequately pled. Because the plaintiffs have stated certain primary violations, the corresponding control-person claims may proceed. *E.g.*, *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 450 (S.D.N.Y. 2023).

## VII. Leave to Amend

The plaintiffs request leave to amend given that this is the first ruling on the defendants' arguments for dismissal. *See* Pls.' Ltr. Br. 10 & n.20. The plaintiffs are not entitled to amend yet again after receiving "an opportunity to amend in response to full briefing of the defendants' motion to dismiss" in June 2023, Mem. & Order, ECF No. 94, and also "fail[ing] . . . to explain how [they] propose[] to amend the complaint to cure its defects." *F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017). Leave to amend is thus denied.

## VIII. Conclusion

The motions to dismiss Securities Act Count I (Section 11) are granted in part and denied in part. The claim may proceed against Clarivate, CGMI, PwC, and the individual defendants. Otherwise, this claim is dismissed. Onex Corporation, the Baring Asia Private Equity Fund VI, L.P.1 and L.P.2, and Elgin Investment Holdings Limited will be dismissed from this case. The motions to dismiss Securities Act Count II (Section 15) are denied as to the remaining defendants. The motion to dismiss Exchange Act Count I (Section 10(b)) is granted in part and denied in part. The claim may proceed against defendants Clarivate, Stead, Hanks, and Ahmed, on the misstatements identified in this order. Otherwise, this claim is dismissed. The motion to dismiss Exchange Act Count II

(Section 20(a)) is granted in part and denied in part. The claim may proceed, but the primary conduct supporting this claim is limited to the portion of Exchange Act Count I that survives.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: March 30, 2026
Brooklyn, New York